PHILANISE MARTIN *vs.* ST. ALOYSIUS CHURCH.

NOVEMBER 19, 1915.

PRESENT:   Johnson, C. J., Parkhurst, Sweetland, and Vincent, JJ.

*(1)   Religious Corporations.   Principal and Agent.   Ultra Vires.*

Defendant was a corporation under the law for the incorporation of Roman Catholic Churches.   Plaintiff having brought to the pastor of the parish, who was also treasurer of defendant, certain money, received from the treasurer a note purporting to be the note of defendant corporation.   The money was placed in the common fund of the church and paid out as occasion arose for any of the purposes of the corporation.

Plaintiff made repeated loans, which were entered on the back of the note, and at stated periods the accumulated amounts with the interest were put into a new note.

The by-laws of defendant provided that in the incurring of any indebtedness, exceeding the sum of $500, the action of a quorum of the trustees must be confirmed by certain church authorities, and that no member of the board of trustees should have any power to sign any note or contract any liability except in pursuance of a special resolution of the trustees entered on the records and signed by three trustees and confirmed by the stated authorities.

This by-law was habitually ignored by the treasurer, and the business was carried on solely by him, including the contracting of many and large debts, all of this with the knowledge of the other members of the corporation.

From 1902 apparently no meetings of the corporation were held.   The by-laws provided for an examination of the treasurer's books, but this was not done.

It appeared from the records of the treasurer that certain sums borrowed were authorized, but the meetings were not held.   The treasurer in accordance with the by-laws forwarded to. the Bishop a statement showing money borrowed, for many years, but such statements did not contain items of many borrowings, made by written consent of the Bishop.   It did not appear whether or not the money loaned by plaintiff was a part of the debts covered by the special resolutions shown in the records authorizing the treasurer to borrow specific sums of money, nor whether such loans were a part of debts reported by the treasurer.   Each year the treasurer wrote up records of a meeting which had not been held and sent them to the secretary to sign; all business recorded related to the purchase of real estate:

*Held,* that the money was had and received by defendant, for the possession of the treasurer was the possession of the church.

*Held,* further, that when a religious corporation engages in purely secular affairs, it is subject to the same principles of law and the same doctrines as to ratification, acquiescence, and estoppel as a private civil corporation.   The society cannot accept the benefits of a transaction and then refuse to pay on the ground that the contract was *ultra vires.*

*Held*, further, that the rule that the separate and individual action of the trustees or any number of them, not meeting and taking action as a board, could not create a corporate liability, did not apply to a case where the ground relied on was the abandonment by the trustees of the business affairs of the corporation to the treasurer, and their negligent acquiescence therein.

*(2)  Principal and Agent.  Evidence.*

While the declarations of an alleged agent are not admissible against the alleged principal to prove the fact of agency, the *testimony* of the agent is competent in establishing the fact of agency.

*(3)  Banking.*

It appeared in evidence that as well as borrowing from the plaintiff in behalf of the church the treasurer also borrowed from a large number of persons in the same manner; giving them notes and when they required the money, paying it with interest.   This occurred almost daily.

*Held*, further, that the transactions did not constitute a banking business.

ASSUMPSIT.   Heard on exceptions of defendant and over-ruled.

JOHNSON, C. J.   This is an action of assumpsit.. The declaration contains counts upon promissory notes, for money had and received and for accounts stated.

The defendant is a church corporation of the Roman Catholic faith, established in the city of Woonsocket in 1902 by incorporation under the law of 1869, amended by the law of 1871, for the incorporation of Roman Catholic churches. Under this law the Bishop, the Vicar General and the pastor of the congregation, together with two laymen selected each year by them from the lay members of the congregation, constitute the membership of the corporation.

Shortly after the incorporation of the defendant in 1902 the members met, organized and adopted by-laws.   The by-laws provided that the Bishop should be *ex officio* chairman of the corporation and that the members should annually elect a treasurer and secretary to continue in office until their successors should be elected.   The records of this meeting do not show the election of a secretary and treasurer, but they refer therein to the pastor, Rev. Mederic Roberge, as treasurer.   Such records as were produced of

meetings held after 1902 either refer to ·Rev. Mederic Roberge as treasurer or set forth his election as treasurer. At any rate, from the foundation of the parish to early in the year 1914, Rev. Mederic Roberge acted as treasurer of the corporation with the knowledge of all the members of the corporation.

The plaintiff, Philanise Martin, whose residence is New Bedford, Massachusetts, was by occupation a weaver in the Social Mills at Woonsocket, and prior to her removal to New Bedford five years ago, had lived in Woonsocket for many years. Her earnings as a weaver amounted to about $10.00 per week, and in 1902, having on hand the sum of $450.00, she brought the same to Mederic Roberge, who at that time and continuously during the period covered by the transactions shown in evidence was the pastor of the parish and treasurer of the defendant corporation, for which she received from said Mederic Roberge, Treasurer, a note purporting to be the note of the defendant corporation, and signed "St. Aloysius Church, Woonsocket, Mederic Roberge, Treasurer." Mederic Roberge, when asked as to the nature of his business dealings with the plaintiff, said: "She used to bring me her savings." "Q. And how much was her first loan? A. Her first loan was $450. Q. What evidence did you give her of the Church's indebtedness to her? A. I gave her a note. The same as the note I gave to the bank, as treasurer. Q. You mean signed the same as the note you gave to the bank as treasurer? A. The same. St. Aloysius Church, Woonsocket, Mederic Roberge, Treasurer." He testified that this was about June, 1902; that following that first loan and note she made further loans to the church very frequently, sometimes once a month, sometimes twice a month. Asked what evidence he gave her of these loans, he answered: "Well, I used to enter those loans on the back of the note she had first and then every six months I added these small loans to the loan that was on the face of the note, and put interest money and new note. Q. Make a new note? A. Yes. Dated at the time." The testimony

was that this continued until an occasion when the plaintiff
sent some money by mail, and kept her old note when a new
note was given to plaintiff and thereafter she sent or carried
sometimes one note and sometimes the other.   These notes
were always payable on demand, with interest at the rate of
six per centum per annum.   At the time of the commence-
ment of this suit the plaintiff held two such notes of the
defendant corporation, one for $1,250.62, dated July 25th,
1913, and the other for $3,000, dated November 1st, 1913.

Two articles of the by-laws, the 4th and 8th, introduced in
evidence, are as follows:

"IV.   At any regular meeting of the board a majority
of the trustees, one of them being a layman, shall constitute
a quorum for the transaction of business; but in all matters
relating to the sale or mortgage of the property of the church
or to the incurring of any indebtedness on the part of the
church, exceeding the sum of five hundred dollars, the acts
of such quorum in order to be valid must be confirmed by
the written approbation of the bishop or of the adminis-
trator of the diocese."

"VIII.   No member or members of this board shall have
any power or authority to sign any note or bond or any
other evidence of debt or to contract any debt or liability on
the part of this corporation, except in pursuance of a special
resolution of the board of trustees for that purpose entered
on its minutes and signed by at least three trustees and in
conformity with the fourth article of these by-laws."

The latter by-law was however habitually ignored by the
treasurer with the knowledge of the other members of the
corporation.

It appeared from the evidence that the business of the
corporation was carried on solely by the treasurer.   Business,
which included the contracting of many and large debts was
transacted by him alone with the knowledge of the other
members of the corporation.

In the year 1902 the pastor and the two lay members of
the corporation held two meetings, but afterwards no

meeting of the corporation apparently was ever held, although records of such meetings from 1906 to 1914 were drawn up by the treasurer and signed by the secretary. From 1902 until 1906, however, not only were meetings not held, but no records of meetings were made.

From 1902 until 1914 Rev. Mederic Roberge, from his testimony, alone and without the participation of any other person, exercised the functions of the corporation and transacted all its business. He built a church edifice and determined alone the plans and specifications thereof, selecting the architect and contractor, and making the contract therefor, which involved the expenditure of $28,000 or $30,000. He ordered extras in the construction of the church building and paid for them out of corporation funds. He selected, and made the contract for, the furnishing of the church. He hired in the name, and paid for from the funds of the church, men to do the grading around the church edifice, involving the expenditure of $1,500. He determined upon establishing a parochial school for his parish, which he purchased and maintained in the name and at the expense of the corporation. In the course of his treasurership whenever repairs were necessary he made contracts therefor and paid for the same out of the corporation funds. During his treasurership he engaged all the labor and personal service that were required by the church, including services of the organist, sexton, etc. He purchased in the name and paid for from the funds of the corporation all the supplies used in the church during his treasurership.

In one of the meetings of the corporation held in 1902, the treasurer was authorized to borrow $15,000 at the Globe National Bank, Woonsocket, Rhode Island, payable with interest at the rate of four and one-half per cent. Under this authority he borrowed the money authorized and gave the note of the corporation therefor. Every six months later without any further authority, but with the knowledge of the members of the corporation, he renewed this note, paying the interest and sometimes a part of the principal.

In addition to borrowing this sum authorized he also borrowed various sums from the Mechanics Savings Bank, Woonsocket, Rhode Island, with the knowledge of the members of the corporation, but without a resolution authorizing the loans. He also borrowed on different occasions, and at different times, from the various banks in the city of Woonsocket. The evidence does not show whether every particular loan was known to the members of the corporation, but on one occasion at least the note for the loan was endorsed by the two lay members of the corporation. The treasurer was also in the habit of borrowing for the corporation during the time of his treasurership from various individuals with the knowledge of other members of the corporation.

The by-laws provide for the examination of the treasurer's accounts at least once a year by two of the members of the corporation and for the delivery to the Bishop of a copy of the statement thereof. The accounts of the treasurer however were never examined by any one. The practice was for the treasurer to prepare a statement and have the lay members of the corporation sign the same without any examination of the treasurer's books in which he kept his accounts. When the books were presented to them for examination they neglected to examine, saying they did not want to see the books.

The books of the treasurer were inartificially kept. Many items, both of receipts and expenditures, are omitted. There is no record in the books of the receipt of $4,500.00 borrowed and authorized in 1906, of $2,500.00 borrowed and authorized in 1909, of $1,500.00 borrowed and authorized in 1910, of $400.00 borrowed and authorized on January 26th, 1912, of $400.00 borrowed and authorized on April 1st, 1912, of $200.00 borrowed and authorized on May 21st, 1912, and of $500.00 borrowed and authorized on December 23rd, 1912. As to these sums referred to above as authorized, it appears by the records made by the treasurer that they were authorized, but the meetings were not held. There is no

entry in the books of the expenditure of $4,500.00 for the
purchase of real property in 1906, or for the expenditure,
except for an inconsiderable part, for the building and
equipment of the church in 1902 and 1903.    As to said item
of $4,500.00, Father Roberge testified on cross-examination:
"I forgot to charge it.    I put the note into the assets of the
church the note but I forgot to charge up to the church."
The accounts of the treasurer were kept in two books, the
larger called the treasurer's book, apparently containing
only the routine receipts and expenditures, and a smaller
book containing the loans to the corporation and a list
of the outstanding notes.

Each year during his treasurership, except in 1913, the
treasurer, Rev. Mederic Roberge, in accordance with the
by-laws, forwarded to the Bishop a copy of the statement of
the corporation's financial affairs.    These statements to the
Bishop were made out on printed forms with which the
treasurer had been furnished, and these forms contained,
among other printed requests for information, requests
for statements of the amount of "Money Borrowed," and of
"Amount of Debts."    Under the heading of "Money
Borrowed," no statements were made except for the year
1902 when $15,000 is reported and for the year 1909 when
$1,000 is reported, although in addition to the borrowings
reported, $4,500 was borrowed in 1906, $2,500 in 1909,
$1,500 in 1910, and $1,500 in 1912, with the knowledge and
by the written consent of the Bishop.    Neither are the
expenditures, before referred to, of $4,500 for the purchase of
real estate in 1906 reported in the statement to the Bishop,
although this expenditure was authorized and consented to
in writing by the Bishop.    Under the heading, "Amount of
Debts," the debt from 1909 to 1912, inclusive, remains the
same, namely, $12,980.00, although it appears that the debt
was increased in 1912 by four loans to the church in that
year, amounting in the whole to $1,500.

Although the records show special resolutions authorizing
the treasurer to borrow specific sums of money, it nowhere

positively appears whether or not the money loaned by the plaintiff was a part of the debts of the corporation reported by the treasurer. The latter testified that he was unable to say whether the debts reported included the loans by the plaintiff. Neither does it positively appear whether in any of the instances of the loans by the plaintiff to the defendant, the treasurer acted under any of the resolutions recorded in the record book of the defendant corporation, or under his custom to borrow without such authority. Father Roberge testified that in November, 1907, the Bishop on the occasion of a call at his parish, finding that no meetings had been held since 1902, informed him that he should have his records written up, and for his convenience wrote up records for a meeting in the preceding January which had never been held, and told him to have the secretary sign them.

Thereafterwards, using the record that the Bishop had written as a model, Father Roberge each year wrote up records for a meeting which had not been held, and sent them to the secretary for his signature. In the records of meetings actually held in 1902, as also in the records of meetings not actually held, the only business transacted, or recorded as having been transacted, had relation to the purchase of real estate; no other business was ever transacted or recorded as ever having been transacted.

From 1902 up to 1913 or 1914, no business, except in relation to acquisition of real property, was transacted, in which any member of the corporation, except the treasurer, took part.

No testimony was introduced denying the loans made by the plaintiff; no testimony was introduced denying the due execution of the notes by the treasurer; and no testimony was introduced denying the acts which he testified that he had performed in the exercise of his treasurership or showing that any other person had participated with him in the management of the affairs of the corporation. Father Roberge testified that all the members of the corporation knew that he was borrowing money, both from the banks

and from individuals, and although the members of the corporation for the various years, were accessible to the defence, none of them was called to contradict Father Roberge's testimony in this respect. For about twelve years the members of the corporation allowed Father Roberge to do what he pleased in the name of the corporation and in the management of its affairs. Neither the Bishop nor the Vicar General ever attended a meeting in the twelve years of the corporation's existence, although the former was by his office chairman thereof; and the lay members only attended the meetings of the first year. The lay members never examined the treasurer's books and accounts, although the duty to do so was imposed upon them by the by-laws.

The defendant offered to introduce in evidence the various reports of the treasurer to the Bishop, in which specific mention of the claims in suit was not made except in the report of 1913. These reports were finally allowed to be introduced by the court in so far as they affected the credibility of Father Roberge. The latter was cross-examined with respect to these reports, and a number of the defendant's exceptions related to this cross-examination.

The foregoing facts, except where otherwise indicated, were testified to by the plaintiff and by the Rev. Mederic Roberge, whom the plaintiff called as a witness. None of these facts were controverted or denied by the defendant. The only witness testifying in behalf of the defendant was the Bishop, whose testimony did not controvert the above facts. As far as his testimony goes it is to deny any knowledge of borrowing on the part of the treasurer beyond that reported in the annual statements of the treasurer. The case was tried before Mr. Justice Barrows and a jury on October 21st, 22nd, 23rd and 26th, 1914, at the Woonsocket session of the Superior Court, commencing the third Monday of October, 1914. At the conclusion of the evidence for the plaintiff and for the defendant, the court directed the jury to return a verdict for the plaintiff for the sum of $4,483.57, and the

case is now before this court upon the defendant's bill of exceptions.

The exceptions are to the granting of the motion for the direction of a verdict for the plaintiff; to the denial of the motion for the direction of a verdict for the defendant; and to rulings upon the admission and exclusion of evidence.

In their argument upon defendant's exceptions, counsel contend that: "The treasurer of a corporation formed for ideal purposes has no inherent, implied or *ex officio* power to bind the corporation by executing negotiable paper." The verdict for the plaintiff was not directed by the judge upon the ground that the treasurer of such a corporation had such inherent, implied or *ex officio* power.

In granting the plaintiff's motion for the direction of a verdict for the plaintiff, the judge said: "I appreciate that this case is a very unique case and perhaps may involve a good deal more than this particular case, but as I have listened to it and as it strikes me, it seems to me that the only possible question which I could submit to the jury here would be a question of the credibility of Father Roberge, as to the question as to whether or not this money was loaned and as to whether or not he was allowed to conduct all the affairs of the corporation himself. On those two points it seems to me that, without any testimony on the other side having been introduced, I am not justified in submitting that question to the jury. The case of *Savage* vs. *The Rhode Island Company*, in the 28 R. I., at 391, it seems to me rules me on that particular point. So that Father Roberge not having been disputed and the only dispute or doubt of his story coming from such guesses as I might ask the jury to make from the absence in the records of certain entries, it seems to me I am not justified in saying that this money has not been loaned.

"The other question is a question largely of law and the court has already intimated and perhaps more than intimated—stated positively its views on that law. That point I appreciate is a close point and not perfectly plain. It

does seem to me, however, that it was within the corporate power of this organization, St. Aloysius Church, to borrow money for their religious uses.   Father Roberge's testimony has been that the money that he borrowed from this woman was used for religious purposes and so it seems to me that it cannot be said that his acts in that respect were beyond any authority that the corporation possessed under any circumstances.   It seems to me that in that respect the case is very nearly like the Lincoln case, which was referred to the other day in the argument, that the trustees having given over to Father Roberge the entire management of the enterprise, while he was expressly forbidden by the by-laws from doing certain acts, when an innocent third party is loaning money to a man who is so entrusted with the authority by the other trustees, that the corporation cannot fall back on the defence that that was not authorized or was beyond the pale of corporate action.   So it seems to me in this case the testimony has shown that the plaintiff had no knowledge of Father Roberge's excess of authority and I don't see anything to show that she was chargeable with anything to put her on inquiry of his excess.   I don't know just where the line is to be drawn between a banking business and a loan business, but in this particular case, from the state of the evidence as far as this particular plaintiff is concerned, it does not seem to me I could fairly submit to the jury the question of whether she was chargeable or put upon inquiry that Father Roberge was doing a banking business.   Therefore, it seems to me I am compelled to grant the motion of the plaintiff for the direction of a verdict and, as a corollary, to deny the motion of the defendant.''

The cases which defendant's counsel cite to the effect that treasurers of non-trading corporations have no authority, by the mere name and nature of their office, to borrow money are not lacking in language, indicating that such authority may be implied from the conduct of the corporation.

Thus in *Craft* v. *So. Boston Railroad*, 150 Mass. 207, cited by the defendant, the court, after holding that the power to

borrow money could not be implied from the name and
nature of the office of treasurer, says: "It does not appear
that the company in any way held out Reed to the public
or to the plaintiff as having any such authority. . . .
Action, therefore, cannot be maintained on note."

In *Cattron* v. *First Universalist Society*, 46 Ia. 106, also cited
by the defendant, the court said: "Upon an examination of
the articles of incorporation introduced in evidence, it
appears that the business of the defendant was required to
be managed and conducted by the officers as a board of
trustees. The officers consisted of a president, two vice-
presidents, a secretary and a treasurer. The president and
secretary only executed the note sued upon, and there is no
showing that by any by-law, act, resolution or custom of
doing business, authority was conferred upon the two officers
named to execute notes or transact other business of the
corporation. In the absence of such showing it must be
conceded that the note was not originally executed and
delivered by the defendant."

In *Merchants Bank* v. *Citizens Gas Light Company*, 159
Mass. 505, the court after deciding that the treasurer of the
defendant corporation had no authority, by virtue of his
office, to borrow money and sign notes, says, p. 506: "On
the facts proved at the trial the plaintiff might well claim, if
the jury believed the evidence, that the treasurer had
authority to endorse the notes in suit, derived not from any
expressed direction, but from the course of conduct and
dealing of the treasurer with knowledge and implied assent of
the directors of the corporation."

That the treasurer might have authority to borrow money
and give the notes of the corporation therefor, derived not
from any express direction of the corporation, but from the
course of conduct and dealing of the treasurer with the knowl-
edge, acquiescence and implied assent of the members of the
corporation, is well supported by authority.

In *Beers* v. *Phœnix Glass Company*, 14 Barbour, 360, the
court says: "If the managers faithfully perform their duty,

they exercise a constant and vigilant supervision over the acts of their officers, and where such acts are unauthorized, or in opposition to their will, they should, and probably do, direct their discontinuance, and in case of wilful or palpable violation of duty, dismiss the agent. . . .  If the directors of a company, no matter whether through inattention or otherwise, suffer its subordinate officers to pursue a particular line of conduct for a considerable period, without objection, they are as much bound to those who are not aware of any want of authority,. as if the requisite power had been directly conferred."

In *Perry* v. *Council Bluffs Water-Works Co.*, 67 Hun. 458, the court said: "The questions presented for review are, whether the defendant corporation is liable upon the note, and, if liable, to what extent?

"Upon the former, as to defendant's liability, we might content ourselves with resting the case upon the reasonings contained in the opinion of the learned referee, which, upon the evidence, disposed of the defenses that plaintiff is not a *bona fide* holder for value, and that the note in suit was issued without authority of the defendant and was not its obligation, and points out the distinction between this case and that of *First National Bank of Middletown* v. *This Same Defendant* (56 Hun. 412). It is not claimed that the evidence is insufficient to support the findings of fact made by the referee, and upon such evidence we think he has correctly interpreted the decisions and drawn correct legal conclusions.

· "He finds that during the period from sometime in the month of October, 1885, to February 27, 1887, Harry Allen, as treasurer of the defendant corporation, made and issued in the name of the defendant, and to which the name of the· defendant was signed by himself as treasurer thereof, some forty to fifty promissory notes, to the order of, and indorsed 'Allen & Stead,' which were negotiated, and money obtained thereon; that the reason for the making of such promissory notes to the order of Allen & Stead was that they were acting as the financial agents of the defendant, and it was to give

additional credit to such notes, the credit of the corporation itself being poor; and, although the by-laws of the defendant required the countersigning by the president, none of these notes so issued was so countersigned; that the note in suit was, in form, similar to these others; that during all this period, with the exception of one in May, 1886, no meetings of the board of directors were held, and at the one meeting no business was transacted other than the re-election of officers of the defendant; that Allen, though he sought to consult and advise with the president of the corporation, was referred to the latter's law partner, who was also a director in the corporation, that none of the officers or directors used or exercised any official supervision over Allen or his acts and transactions as treasurer, except the director who was the president's law partner, and who, it would appear, was not only consulted with respect to the making of the promissory notes, and the obtaining of money thereon, but concurred in the very beginning with the making of such promissory notes; that further, he not only advised the making and issuing of such notes from time to time, but personally indorsed a large number of them, and one with the name of his firm, of which the president was a member.

"A review of the evidence supporting these findings will sustain the referee and justify his conclusion that Allen was practically the corporation, and that the case is brought within the principle laid down in *Fifth National Bank* v. *Navassa Phosphate Company* (119 N. Y. 256), because he was not only the treasurer of the defendant, but, as said in that case, 'he was consciously invested by the company with the broad general power inseparable from the position in which it placed him as the sole manager of its affairs at its principal place of business.' Acting, therefore, within the apparent scope of the authority conferred upon him by the corporation, the latter is charged with liability, irrespective of the question of authority in fact."

In *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 30, at p. 58, the court said: "The company placed in Schuyler's

hands the very instrumentalities by which the injury was wrought. They imposed restrictions upon their use, but they omitted the safeguards that ordinary prudence would dictate, to discover or prevent their abuse. A wrong which ordinary care will prevent, is in a legal sense, caused by the omission of that care where it is a duty to use it. At any stage, a discovery of Schuyler's past frauds would have arrested his career of crime. A discovery would have followed the examination of the books of the office, which were the only records of the vast stock transactions of the company at New York. An examination was a duty, because it was the obvious dictate of good sense as the easiest and safest check upon the agent's conduct. The long continued and reckless omission was therefore a culpable negligence, without the concurrence of which Schuyler could not have committed the frauds by which the defendants have suffered; for it was this omission of duty that left him with power to wield the weapons with which the company had armed him, and therefore it may be said to have led directly to the injurious acts." And at p. 50: "A corporation aggregate being an artificial body—an imaginary person of the law, so to speak—is, from its nature, incapable of doing any act except through agents to whom is given by its fundamental law, or in pursuance of it, every power of action it is capable of possessing or exercising. Hence, the rule has been established, and may now also be stated as an indisputable principle, that a corporation is responsible for the acts or negligence of its agents while engaged in the business of the agency, to the same extent and under the same circumstances, that a natural person is chargeable with the acts or negligence of his agent; and 'there can be no doubt,' says Lord Ch. Cranworth in *Ranger* v. *The Great Western R. R. Co.*, 'that if the agents employed conduct themselves fraudulently so that if they had been acting for private employers the persons for whom they were acting would have been affected by their fraud, the same principles must prevail where the principal under whom the agent acts

is a corporation.' (5 House of Lords Cases, 86, 87; *Thayer v. Boston*, 19 Pick. 511; 4 Serg. & Rawl. 16; 7 Wend. 31; *Frankfort Bank* v. *Johnson*, 24 Maine, 490; Story on Agency, Sec. 308; Angell & Ames on Corp., Sec. 382, 388.")

In *Rathbun* v. *Snow*, 123 N. Y. 343, the court said: "It follows from the general principle, now well settled, to the effect that third persons may act upon the apparent authority conferred by the principal upon the agent, and are not bound by secret limitations or instructions qualifying the terms of the written or verbal appointment, that the defense·based upon the limitation in the by-laws of the company, of which the plaintiff had no knowledge, cannot be sustained. By-laws of business corporations are, as to third persons, private regulations binding as between the corporation and its members or third persons having knowledge of them, but of no force as limitations *per se* as to third persons, of an authority which, except for the by-laws, would be construed as within the apparent scope of the agency."

See, also, *Eliot National Bank* v. *Woonsocket Elec. Mach. & Power Co.*, 31 R. I. 57, where the foregoing cases are cited, discussed and approved.

"When a corporation, formed for the control of property for religious purposes, engages in purely secular affairs, such as the building of churches, it becomes subject to the same principles of law and the same doctrines as to ratification acquiescence, and estoppel as a private civil corporation. The society cannot accept the benefits of a transaction and then refuse to pay on the ground that the contract was *ultra vires*." 24 Am. & Eng. Encyc. of Law, p. 346.

In *Moore* v. *F. R. C. M. E. Church*, 117 Iowa, 33, 34, the court says: "We cannot assent to the proposition that the secular acts of religious corporations are to be governed by principles of law other than those applied to civil corporations. A corporation formed for the advancement of religion and for the control of property for religious purposes may, to a very great extent, determine the rules by which its affairs shall be controlled; but when it engages in purely

secular business, such as the building of churches, and the like, it becomes subject to the same rules and principles which govern other corporations."

In *Norwegian E. L. B. C.* v. *U. S. F. & G. Co.*, 81 Minn. 32, 37, the court says: "On principle and authority, religious corporations must be governed by the same rules that control private civil corporations. The equitable doctrine of ratification, acquiescence, and estoppel applies with the same force to members of a religious society as to stockholders in an ordinary civil corporation. A religious society or organization authorized by law to build its church has power to direct its trustees or a committee of its members to supervise and control the work. It may put the entire matter into the hands of its board of trustees, or into the hands of a so-called building committee. If the board or committee act without preliminary direction or authority in any particular manner, no reason exists why there cannot be a full, complete, and binding ratification and approval by the congregation of these acts. There certainly can be no distinction made in this respect between a religious corporation and one of the ordinary civil character."

In *Wilson* v. *Tabernacle Church*, 28 Misc. (N. Y.) 268, 269, the court says: "The contention of the defendant in this case is to the effect that if the treasurer of a religious corporation should in fact borrow money to pay indebtedness incurred for the legitimate purposes of the corporation, and the corporation should thereafter use the money in payment of such indebtedness, they would not be required to repay the same if the board of trustees of the corporation at the time they used the money were not aware of the fact that the moneys were the proceeds of a loan and not a contribution. No authority has been called to my attention holding any such doctrine. It is contrary to every rule of law and equity. There is no evidence in this case to estop the plaintiff from demanding a return of the money. The dire consequences to religious corporations of applying this rule of law applicable to ordinary business transactions is imaginary rather than real."

Defendant's counsel argue that even if the other trustees knew of the borrowing by the treasurer and the giving of the corporation notes therefor, if they did not act as a body the corporation is not bound. They say in their brief: "For we submit the rule to be; if the trustees of a religious corporation are the only persons empowered to bind the corporation legally, in order to do this the trustees must meet as a board and take action as such. The separate and individual action of the trustees, or any number of them is not binding upon the corporation and cannot of itself create a corporate liability." While the rule stated is supported by authority and we do not here question its soundness, it is not applicable to a case where the ground relied upon to establish the authority of the treasurer to borrow money and give the notes of the corporation therefor, is, not the action of a portion of the trustees or all of them acting separately, and not as a body, in so borrowing, but the abandonment by the other trustees of the whole conduct of the business affairs of the corporation, including such borrowing, and giving of notes, to the treasurer, and their negligent acquiescence therein.

Is the defendant liable for money had and received and for account stated? The testimony of the plaintiff and of the treasurer of the defendant corporation is that the plaintiff carried the money to the church and there delivered it in person to the treasurer, on the various occasions of her loans. The money was received by the treasurer and by him placed in the common fund of the church, in its safes, from which it was paid out, as occasion arose, for any of the purposes of the corporation. The funds of the church were wholly in the charge and under control of said Roberge and were dispensed by him apparently without any restriction by the other members of the corporation. From this common fund he not only paid the routine expenses, but also dispensed the charities of the church. It thus appears that the money of the plaintiff was had and received by the defendant; for the possession of the treasurer was the possession of the

church.   In *Cook* v. *American Tubing & Webbing Company*, 28 R. I. page 65, the court says: "We are at a loss to imagine, therefore, how it can be contended, as against this claimant, that the sum lent, did not come to the possession of the webbing company.   When it was deposited to their credit it was as completely under their control, so far as appearances went, as if it had been handed in specie to the treasurer in their office."   In the case at bar it was so handed to the treasurer.

(2)      These facts seem to present a just and proper case for money had and received.

Defendant's counsel contend that the rule that, "The declarations and representations of a person presuming to act as the agent of another are not admissible to prove his agency," was violated by the admission of the testimony of Roberge that he acted as treasurer of the defendant corporation and that he borrowed money from the plaintiff and others for the corporation and gave the notes of the corporation therefor.   Counsel also include as open to the same objection the admission of the testimony of the plaintiff that she had business dealings with the defendant corporation and loaned money to it; and that she had those dealings with Mr. Roberge himself as treasurer, which testimony preceded said testimony of Roberge, an objection to the continuation of this line of testimony having been sustained until the authority of Roberge should be established.

While it is the general rule that the declarations of an alleged agent are not admissible against the alleged principal to prove the fact of his agency, the *testimony* of the agent is competent in establishing the fact of agency.

In Mechem on Agency, § 285, it is said: "The agent certainly cannot confer authority upon himself or make himself agent merely by saying that he is one.   Evidence of his own statements, declarations or admissions, made out of court therefore (as distinguished from his *testimony* as a witness), is not admissible against his principal for the purpose of establishing, enlarging or renewing his authority." See §§ 291–292.

"In receiving the testimony of the alleged agent to prove or disprove the fact of agency, the general rule that a witness must testify to facts and not to conclusions, is applicable, and hence it is not competent for the agent to give his opinion or state his conclusion as to the fact of agency; but he may state the facts and circumstances concerning the various transactions between him and the alleged principal, leaving the court and the jury to determine, under the facts disclosed, whether or not he was such agent." 31 Cyc. 1652; 2 Corpus Juris, p. 935, § 691.

"The rule that the declarations of an agent are, as against his principal, inadmissible to prove the fact of his agency does not apply to his testimony as a witness on the trial in which such fact is in issue; and consequently the testimony of the agent, unless he is disqualified for some other reason, is competent to establish the fact of his agency, and the existence of facts from which the agency may be inferred, at least where the authority was verbally conferred; and to refuse to allow him to testify and be cross-examined is reversible error." 2 Corpus Juris, § 689. See, also, *Howe Machine Co.* v. *Clark*, 15 Kansas, 492; *Gould* v. *Norfolk Lead Co.*, 9 Cush. 338; *Rice* v. *Gove*, 22 Pick. 158; 40 Cent. Dig. Tit. Principal and Agent, § 39.

The defendant takes nothing by this class of exceptions.

(3)    Defendant's counsel also contend that the acts of Father Roberge in borrowing of various people, including the plaintiff, in small sums repayable on demand with interest, amounted to a banking business, and were *ultra vires* as to the defendant itself, and such acts could not bind the defendant or be ratified by it.

Defendant has cited and quoted various authorities and cases giving definitions of banking, among others *Oulton* v. *German Savings Security, etc.*, 17 Wall. (U. S.) 118, where the court says: "Banks in the commercial sense are of three kinds, to wit: 1, of deposit; 2, of discount; 3, of circulation. Strictly speaking the term 'bank' implies a place for the deposit of money, as that is the most obvious purpose of

such an institution. Originally the business of banking consisted only in receiving deposits, such as bullion, plate, and the like, for safe keeping until the depositor should see fit to draw it out for use, but the business, in the progress of events, was extended, and bankers assumed to discount bills and notes and to loan money upon mortgage, pawn, or other security, and at a still later period to issue notes of their own intended as circulating currency and a medium of exchange instead of gold and silver. Modern bankers frequently exercise any two or even all three of those functions, but it is still true that an institution prohibited from exercising any more than one of those functions is a bank in the strictest commercial sense."

In 5 Cyc. 432, banking is defined as "the business or employment of a banker, the business of establishing a common fund for lending money, discounting notes, issuing bills, receiving deposits, collecting the money or notes deposited and negotiating bills of exchange;" and a banker as "a dealer in capital—an intermediate party between the borrower and the lender," citing *Meadowcroft v. The People*, 163 Il. 56, 65, where the court says: "A banker is a dealer in capital—an intermediate party between the borrower and the lender,—who borrows of one party and lends to another: and the business of banking is, among other things, the establishing of a common fund for lending money."

Cyc. also cites *Curtis v. Leavitt*, 15 N. Y. 167, where a banker is defined as "a dealer in capital—an intermediate party between the borrower and the lender. He borrows of one party and lends to another, and the difference between the terms on which he borrows and lends is the source and measure of his profits."

It appears from the testimony of the treasurer of the defendant corporation in his cross-examination upon the subject of his annual reports to the Bishop, that as well as borrowing from the plaintiff in behalf of the church he had also borrowed from a large number of other persons in the same manner that he had borrowed from the plaintiff; that

he gave to them in each case a promissory note, that whenever the lenders wanted the money he paid it to them with interest up to date. He estimated their number at "may be a little more may be a little less" than three hundred. He said he received some money every day and gave some every day, almost every day. The court asked: "Do I understand, Father Roberge, that you were acting as kind of a savings bank for those people? They came and deposited money with you and then you gave them a church receipt for it and then they came and drew it any time they wanted to?" WITNESS: "Well, your Honor, of course, to run my institutions I needed money and I knew I was authorized to borrow money and my people found that very convenient, to come to my house and bring one, two, or five dollars, so they might have a little amount of money in case of need. It was more convenient for them to come to my house and pay it than to go to the banks where it was so far." THE COURT: "Well, they were loaning it to you to run the institutions, you say? Is that the way you gave them to understand?" WITNESS: "Oh, yes, always, your Honor."

Again he testified: "I live on Rathbun street and great many of my people live farther yet and at that time there was no bank in Social Corner. They have to come on Main street. And great many people wanted to save a little money and they brought me their money. Not as in a bank. I know I needed money and I use that money to run my church, but not as a banking institution. Instead of going to the bank to borrow $100.00 or $500.00 I require that money from all my congregation. They receive a little interest and the poor women had not to go a mile and a half or two miles to save a dollar or two. He further testified as to the rate of interest that he paid "four, four and one-half, five, five and one-half, a very few six;" that he paid the interest every six months and if they did not draw interest he added it to the sum. If they drew the interest he made another note dated from the day he was paying the interest,

"so that the date of the face of the note was the date from which the interest began."

The annual reports to the Bishop were admitted in evidence only so far as they tended to impeach the credibility of the treasurer's testimony. If however the testimony as to loans by others than the plaintiff may be considered for the purpose of giving character to plaintiff's loans, can the borrowings by the defendant be considered as banking operations? Neither frequency of borrowing, the amounts borrowed, nor the number of persons borrowed from, is sufficient to make the borrower a banker or to render such transactions banking operations. As the court said in *Curtis* v. *Leavitt*, 15 N. Y. 56: "Borrowing is not banking, nor in any just and proper sense any kind of business. It is the incident and auxiliary of various kinds."

None of the characteristics or incidents of banking being present in the transactions shown in evidence, except borrowing, which is incidental to various kinds of business, we are of the opinion that said transactions cannot be held to constitute a banking business.

In our opinion the court did not err in the direction of a verdict for the plaintiff. There was consequently no error in the denial of the motion for the direction of a verdict for the defendant. We have considered the defendant's exceptions to the admission and exclusion of evidence and find no reversible error therein.

All of the defendant's exceptions are overruled and the case is remitted to the Superior Court with direction to enter judgment for the plaintiff upon the verdict.

*Greene & Rousseau*, for plaintiff.

*John J. Heffernan, James H. Rickard, Jr., John H. Flanagan*, for defendant.